IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CRIMINAL NO. 05-00270-CB |
| BENJAMIN KNOX, | ) | |
| Defendant. | ) | |

## ORDER

On June 21, 2010, the Court held a competency hearing in this matter to determine whether the Defendant, Benjamin Knox, had been restored to competency. The hearing was held over the objection of Defendant's counsel, who had requested a continuance of the proceedings. For reasons discussed below, the Court found that a further delay was not essential to counsel's ability to participate effectively in the hearing. Moreover, after considering all relevant information and evidence, the Court finds that the Defendant is competent to stand trial.

## I. Background

The recent competency hearing was the culmination of a long road of examinations, evaluations, motions, delays and hearings. The following is a chronology of events.

*Indictment & Initial Proceedings*

Defendant Benjamin Knox was indicted almost five years ago, along with several codefendants,[1] and charged with conspiracy to possess with intent to distribute crack cocaine, conspiracy to commit money laundering and multiple counts of money laundering.[2] Attorney

---

[1] Knox's sons are among his codefendants.

[2] The indictment was superseded (doc. 113), but the crimes charged in the indictment remain the same.

1

Tim Fleming was appointed to represent Knox shortly after Knox's arrest in early October 2005. On November 15, 2005, Knox filed a pro se motion to appoint new counsel. In that motion, Knox complained that Mr. Fleming had not discussed his case with him, had not responded to attempts to communicate and had withheld discovery from him.[3] (Doc. 78.) As a result of Knox's pro se motion, Mr. Fleming also filed a motion to withdraw. (Doc. 79.) The motions were granted, and on November 17, 2005 attorney Richard Alexander was appointed to represent Knox. (Doc. 82.)

### *Defense Requests & Receives Local & BOP Psych Exams*

On January 9, 2006, Mr. Alexander filed a motion for psychiatric examination, stating that "he had met with the Defendant on four separate occasions . . . and, during the most recent visit on January 5, 2006, attorney Alexander was informed by the Defendant that the Defendant believes he has some degree of Alzheimer" and that "in reflecting. . . on prior visitations and the factual issues discussed is now concerned that the Defendant is not retaining information discussed on prior occasions." (Doc. 102, ¶ ¶ 2-3.) In the motion, defense counsel requested that Daniel Koch, Ph.D., a local psychologist, be appointed to perform "a neuropsychological examination" and that the Defendant be transported to Dr. Koch's office for the exam.[4]

After Dr. Koch's examination, defense counsel filed a motion entitled "Defendant's Request for Brain Scan Imagery." (Doc. 178.) Counsel reported that Dr. Koch had concluded "that Mr. Knox suffers from dementia" and that brain scan imagery (an MRI) was necessary to determine the type and onset date. Therefore, counsel requested that the Defendant be

---

[3]The motion was signed by Knox but appears to have been written by someone else and signed by Knox.

[4] Dr. Koch is a clinical psychologist, according to his letterhead.

transferred to a Bureau of Prisons facility for further evaluation. Meanwhile, the government had also filed a motion for psychiatric evaluation in response to a notice of insanity defense filed by Defendant. In April 2006, after a pretrial conference, Magistrate Judge Cassady ordered that Knox be transferred to the custody of the Bureau of Prisons (BOP) for a psychological evaluation, pursuant to 18 U.S.C. §§ 4241 and 4242, to determine "whether he is suffering from a mental disease or defect rendering him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him and to assist properly in his defense" and also "whether at the time of the commission of the acts constituting the charged offenses. . . as a result of a severe mental disease or defect was unable to appreciate the nature and quality or wrongfulness of his acts." (Doc. 189, ¶ 1.) The BOP designated Knox to the Federal Detention Center in Miami for a psychological evaluation.

*First Competency Hearing: Defendant Not Competent*

In September 2006, after Knox returned from FDC Miami,[5] the Court held a competency hearing. After considering the testimony of Dr. Koch and the psychological evaluation prepared by Dr. Koch and by Dr. Guiterrez of the Federal Detention Center Miami, the Court concluded that the Defendant was presently suffering from a mental disease or defect that rendered him incompetent to stand trial at that time. Pursuant to statute, Knox was committed to the custody of the Attorney General for a reasonable time, not to exceed four months, to determine whether there was a substantial probability that his competency could be restored. (Doc. 261.)

---

[5] Because the Court received Knox's Forensic Evaluation in July 2006 but did not set the hearing until September 2006, it appears that Knox's physical return to the district was delayed.

3

### *Restoration & Medical Treatment at FMC Butner—October 2006 to August 2007*

Knox was committed to the Federal Medical Center in Butner, North Carolina. The initial 120-day commitment began upon arrival (October 25, 2006). At the request of the warden in February 2007, the Court extended that commitment period for an additional 120 days because Knox was undergoing treatment for prostate cancer. On August 23, 2007, the Court received a Certificate of Restoration of Competency to Stand Trial, along with a Forensic Evaluation from FMC Butner.

### *Restoration of Competency Hearing Set; Hearing Postponed at Defendant's Request*

After receipt of the certificate and report from FMC Butner and Knox's physical return to the district, the Court set the matter for a hearing on November 5, 2007 to determine whether Knox had been restored to competency. (Doc. 350.) On October 31, 2007, defense counsel filed a motion to continue the competency hearing so that the defense expert, Dr. Koch, could conduct further neuropsychological testing. Also, counsel asserted that he needed to obtain from Butner an MRI image and radiology report as well as all test results from psychological tests performed at Butner. No written order was entered on the motion to continue. However, records kept in chambers reflect that the Court held a telephone conference and orally continued the hearing.[6] Informal reports were made to the Court regarding the status of the case, primarily regarding defense counsel's attempt to obtain records from FMC Butner. Finally, on August 19, 2008, the

---

[6]Mr. Alexander and Gina Vann, the AUSA then assigned to the case, participated in the telephone conference. According to the Court's notes, Knox's medical condition was discussed, and defense counsel talked about Dr. Koch's request for the Butner records. However, the conversation turned to the possibility of a guilty plea. The government had received information (from Knox's son and codefendant, Alvin Knox) that the Defendant wanted to cooperate. Mr. Alexander stated that he had not talked with his client but that he would go talk with him. The hearing was postponed while the parties negotiated, and the parties were instructed to inform the Court of the status of the case .

Court held a telephone conference with Mr. Alexander and AUSA Gloria Bedwell, the newly-assigned prosecutor. In that conference, the Court learned that defense counsel had received the records[7] but that his expert had not reviewed them. In an effort to expedite the matter, the Court entered an order authorizing expert services for Dr. Koch, required the attorneys to participate in joint telephone conferences with Dr. Koch and with the BOP's psychologist or psychiatrist and to report back to the Court by September 19, 2008.

*By Agreement of Parties Defendant Committed for Further Evaluation—United States Medical Center Springfield*

Eventually, the defense and the government reached an agreement that Knox should be recommitted to the custody of the Attorney General for further evaluation and filed a Joint Motion for Further Psychiatric Examination. (Doc. 432.) The Court granted that motion, and its decision to do so was influenced by the concerns of the defense expert (which were relayed to the Court through counsel). At the parties' request, the Court recommended a "Halstead Reitan battery and a forensic assessment by a neuropsychologist" and also recommended that Knox be designated to the United States Medical Center Springfield where a neuropsychologist was on staff. In accordance with the Court's request, Knox was indeed transferred to MCFP Springfield where he underwent a thorough forensic neuropsychological evaluation, including brain scan imagery (MRI), extensive psychological testing (including the Halstead Reitan battery) and observation. Dr. Robert L. Denney, a neuropsychologist with the BOP conducted the evaluation. Dr. Denney's evaluation, which concluded that Knox was competent, was received in chambers on May 17, 2010 and immediately made available to counsel.[8] (Doc. 433.)

---

[7] Defense counsel did not receive neuro-images from MRI's performed at FMC Butner.

[8] The report was not docketed until May 19, 2010. (Doc. 441.)

*Competency Hearing Continued Twice at Defendant's Request*

Upon receipt of the psychological report from MCFP Springfield, the Court scheduled a competency hearing for June 2, 2010. Defendant filed a motion to continue to allow additional time to consult with Dr. Koch. The Court granted the motion and reset the hearing to June 7, 2010. Once again, Defendant filed a motion to continue, citing the need for further consultation with Dr. Koch. Attached to the motion was a letter from Dr. Koch stating that it was likely that a psychological report and further neuropsychological testing would be required. On June 7th, defense counsel appeared for the hearing but reported that his client had possibly suffered neurological damage as a result of a fall suffered in transit from MCFP Springfield to Mobile. The Court continued the hearing for two weeks so that the incident could be investigated. After investigation, the Court concluded that the incident did not affect Defendant's ability to proceed with the competency hearing.[9] Defendant's further requests for continuance were denied.

## II. Psychological Evaluations

Since the first motion for psychological evaluation was filed, Knox has undergone four separate psychological evaluations. The results of those evaluations are summarized below. First, however, some information about the Defendant's personal history--information that is contained in each evaluation-- is helpful.

---

[9] The United States Marshal's Service transported Knox back to Mobile from Springfield via the BOP's Oklahoma City Transfer Center. While housed in Oklahoma City, Knox fell in his cell and hit his chest and head. He was taken to St. Anthony's Hospital in Oklahoma City. A physical examination of Knox in the hospital emergency room revealed no neurological impairment. Several tests were performed, and it appears that Knox was experiencing problems with his kidneys ("renal insufficiency") for which admission and treatment were required.

*Personal History*

Benjamin Knox, an African American male, was born August 10, 1934. He was raised in a large family in Clarke County, Alabama and worked in the cotton fields as a child. He received approximately six years of formal education. He served in the United States Army from 1957 to 1961 and received an honorable discharge. Knox's employment history included work as a cotton picker, construction worker and dog breeder. At the time of his arrest, Knox was retired.

*Local Evaluation by Dr. Koch*

On February 15, 2006, Knox was transported from a local jail to Dr. Koch's office for a one-day evaluation. Dr. Koch administered several psychological tests, including the WAIS-III, the Reading Subset of the WRAT-3 and most of the Halstead Retain Neuropsychological Test Battery. Based on those tests, Dr. Koch concluded that Knox had a full-scale IQ in the Low Average range (85) and a 4th –grade reading level. Dr. Koch found Knox able to appreciate the charges against him and the role of the court . On the other hand, Knox was unable to grasp complex legal issues and tended to ramble when answering questions. Koch believed that, because of memory problems, Knox would be unable to disclose to his attorney information about the facts underlying the charges against him. Koch's diagnosis was Dementia Not Otherwise Specified (NOS), and in his opinion Knox was not competent to stand trial.

*FDC Miami Evaluation*

From May 23 to July 7, 2006, Knox was at the Federal Detention Center in Miami, Florida for evaluation. The Forensic Evaluation, conducted by Manuel Guiterrez, Psy.D., Forensic Psychologist, consisted of eight hours of psychological testing and clinical interviews, telephone consultation with the defense attorney, the prosecutor and Dr. Koch, review of Dr.

Koch's report. (Doc. 253 at 1-2.) Based on the psychological testing, Dr. Guiterrez agreed with Dr. Koch's IQ estimate. Despite test scores in the Low Average range, Dr. Guiterrez noted that "the neuropsychological tests administered by Dr. Koch were indicative of some neuropsychological impairment." Dr. Koch had found the level of impairment to be "Moderate" leading to a diagnosis of dementia. Dr. Guiterrez disagreed with that assessment, however, because Dr. Koch had compared Knox's test scores with those of the general population, rather than those for individuals of the same age, race, gender and education level." Using the appropriate comparison, Dr. Guiterrez found the "[s]ome scores are actually within the Average range, while others show Mild to Moderate deficits. Overall, the results for Dr. Koch's evaluation are indicative of some neuropsychological impairment, primarily in processing speed and executive functions." (*Id.* at 7.) Dr. Guiterrez concluded that Knox met the diagnostic criteria for Cognitive Disorder Not Otherwise Specified (NOS) which "is for disorders that are characterized by cognitive dysfunction presumed to be the direct physiological effect of a general medical condition that do not meet criteria for any of the specific deliriums, dementias, or amnestic disorders." (*Id.*)

The effect of Knox's cognitive disorder on his competency to stand trial was assessed by interview responses and by results of the MacCAT-CA, a test used to assess competency. On the issue of competency, Dr. Guiterrez opined as follows:

> Mr. Knox possesses a limited factual and rational understanding of his legal situation. In addition, he expressed some difficulty in communicating aspects of his case to this examiner. It is believed that he would experience the same problems with counsel. As a result, it is recommended that the defendant be found incompetent to stand trial.

(*Id.* at 8.) No specific treatment was recommended for Knox,[10] and his prognosis was as follows:

> At this time, Mr. Knox is experiencing mild symptoms of depression, however, his overall mental status is deemed to be stable. In terms of his cognitive functioning, it is possible that his abilities will continue to decline with age. The evaluations completed by this examiner and Dr. Koch will serve as a "baseline," and future neuropsychological testing should be completed in order to establish the degree and rate of decline, if any. With respect to Mr. Knox's competency, it is possible that his factual and rational understanding could improve with training. While he suffers from a degree of neuropsychological impairment, his intellectual and memory testing reflect that he possesses sufficient ability to grasp and retain information that is presented to him. Based on these factors, the defendant's overall prognosis is determined to be guarded.

(*Id.* at 10.)

### *FMC Butner Evaluation (Restoration of Competency)*

At FMC Butner, Knox was treated for prostate cancer and other medical complications while undergoing restoration of competency. The forensic evaluation was prepared by Robert G. Lucking, M.D., Staff Psychiatrist, and Angela Walden Weaver, Ph.D., Staff Psychologist. (Doc. 340.) The treatment team looked at prior testing, evaluation and diagnosis, obtained a neurological exam and also administered a bedside neuropsychiatric screening to determine whether there was any underlying brain dysfunction.[11] The neurologist's assessment was "mild cognitive impairment with no dementia pattern, with no executive dysfunction, with no

---

[10] In response to the Court's inquiry as to whether a brain scan should be ordered, Dr. Guiterrez stated that the type of deficits Knox had—mild to moderate, at worst—were unlikely to show up on a brain scan.

[11] According to the evaluation, "the screening examination is an abbreviated version based upon the full neuropsychological assessment, but looks only at key sensitive areas of function. . . A formal neuropsychological assessment battery is necessary to definitively diagnose and characterize the nature and extent of the cognitive deficits." (*Id.*) The report implies that a complete neuropsychological battery was not performed because it is "complex, labor intensive and time consuming" and must be administered by "a trained neuropsychologist." (Doc. 340 at 6.)

malingering pattern, but with major emotional overlay pattern (suggestive of a pseudodementia form of depression)." (Doc. 340 at 5.) An MRI of the brain showed "mild atrophy consistent with age, findings of chronic small vessel ischemic gliosis of the white matter (. . . most often an age-related finding, in this patient's case, [ ] findings are within expected range for age), . . ." (*Id.*)

The evaluators noted that Knox characterized himself as having memory problems but "did not exhibit any evidence of major memory impairment" while at FMC Butner.

> In fact, Mr. Knox demonstrated an ability to learn and remember information necessary to his medical care. As he was newly diagnosed with diabetes, he was educated about diabetes by the nursing staff. Mr. Knox was able to learn about insulin, measuring his blood sugar, and the signs of hypoglycemia. Additionally, he was able to recall specific details of his care and treatment at the community hospitals, such as the number of IV saline packages he had been administered in the ICU. Mr. Knox was able to follow and keep track of his radiation treatments identifying the number he had received when asked. He was also able to identify the date they were terminated when asked after the course of treatment had been completed. The physicians assistant, who was responsible for Mr. Knox's overall care, related that Mr. Knox was knowledgeable about his medical care and on several occasions corrected him (the PA) when he identified the wrong date for a specific treatment.

(*Id.* at 5-6.)

For several reasons, the Butner evaluators took a skeptical view of the usefulness of test results from the two prior evaluations. (Doc. 340 at 13.) First, intentional "sub-optimal performance" on the tests could not be ruled out. In other words, they could not discount the possibility that Knox simply was not putting forth his best effort. (*Id.*) Second, the appropriate tests for measuring memory deficits were not administered. (*Id.*) Third, test results were interpreted using the wrong comparative data, i.e., general population rather than persons of similar demographic profiles. (*Id.*)

10

The evaluators concluded that Knox "may or may not manifest bonafide neuropsychological impairment" and noted that his testing "abnormalities" could be related to a number of possible reasons, including "limited formal education, learning disability, substance abuse or dementia. (*Id* at 13.) The evaluators explained their reasoning for rejecting a dementia diagnosis:

> The diagnosis criteria for Dementia requires the presence of memory impairment and another cognitive deficit such as aphasia, apraxia or agnosia, or executive dysfunction. There is disagreement between the primary evaluator and the neurologist as to the presence of executive dysfunction.

(*Id.* at 15.) Furthermore, "[b]ecause Mr. Knox has not been found to have substantial memory impairment, the diagnosis of Dementia cannot be made." Also, there was insufficient evidence that Mr. Knox's cognitive impairment represents a decline from a previously higher level of functioning. (*Id.*)

Despite his cognitive deficits, the evaluation team believed that Knox was competent. The primary impairment identified was in the area of executive functions, which relates such things as the ability to plan, to anticipate, to change behavior and to think abstractly. However, the basic cognitive functions required for competency—learning, memory and attention—were of sufficient quantity and quality necessary for competency, and the evaluation provided specific examples of Knox's level of understanding of the pending legal proceedings. The opinion did contain a caveat. It suggested that the pace of proceedings might need to be slowed to provide additional time for explanation and understanding. One additional note--the evaluators had no way of determining whether Knox's cognitive deficits were static or evidence of a progressive cognitive decline (such as dementia) and recognized that additional testing could be required if there was further decline.

11

*MCFP Springfield*

The final psychological evaluation in this case was conducted at the United States Medical Center for Federal Prisoners in Springfield, Missouri (MCFP Springfield) from November 19, 2009 to March 25, 2010. (Doc. 441) The Forensic Neuropsychological Report was prepared by Dr. Robert L. Denney, Psy.D., who is both a Board Certified Clinical Neuropsychologist and a Board Certified Forensic Psychologist, and Rachel Fazio, M.S. Psychology Student. Twenty-one psychological and neuropsychological tests were administered to Knox. These included tests to assess effort that were interspersed throughout the testing period. In addition, Knox underwent an MRI brain scan and various medical tests. He was interviewed several times, including three focused clinical interviews. Knox's behavior was also regularly observed by clinical and correctional staff during the evaluation period.

The evaluation contains some significant behavioral observations. First, Knox was found to have more knowledge and understanding of matters than he portrayed himself to have. For example, he claimed not to know about legal issues but "further questioning would typically reveal that he actually did possess this basic knowledge." (*Id.* at 13.) During one interview, he read his indictment, discussed it and asked questions about it. (*Id.*) Knox also demonstrated a greater ability to read and comprehend than prior testing had shown. After being placed on medication for depression, Knox went to the nurse's station and asked for an informational sheet about Prozac. (*Id.* at 13.) After reading the form, Knox commented on one of the side effects—prolonged erection—laughed, and told the nurse he was going to call his wife and tell her. Knox's telephone conversations with his "significant other" shed light on his memory, understanding and reasoning ability. (*Id.* at 13-14). It appears he had no difficult carrying on conversations. He showed, among other things, an understanding of institutional procedures, the

12

ability to calculate the probable date of his return to Mobile (including transportation time), the ability to determine the amount of money he would need for the duration of his stay at Springfield, and a good memory of day-to-day events. Finally, Knox was able to get himself to and from appointments within the institution in a timely manner and also to return to the clinic without an appointment when asked to do so. (*Id.* at 13.)

The MRI results showed "mild to moderate global volume loss and leukoaraiosis" but "no acute pathology." The MRI was compared with the second of two Butner MRI's, which was performed in July 2007, and there was "no interval change." [12] (*Id.*)

The results of the numerous psychological tests administered are well-documented in the report. Dr. Denney's conclusion regarding the validity of testing can be summarized as follows:

> Overall, validity test results indicate that at the very least, Mr. Knox was not consistently applying himself to the best of his abilities during testing. Consequently, neuropsychological test results likely underestimate his true functioning to some degree.

(*Id.* at 18.)

As for diagnosis, Dr. Denney found, based on "several lines of reasoning . . . [that] Mr. Knox does not have Dementia . . . [or] Cognitive Disorder, Not Otherwise Specified." (*Id.* at 22.) This conclusion is based on the following:

- Prior tests, including Dr. Koch's, do not support the dementia diagnosis. Dr. Koch simply used the wrong demographic data to interpret his results. Both Dr. Guiterrez and the Butner evaluators also disagreed with Dr. Koch's diagnosis.

- Because Knox performed inconsistently on certain tests, test results showing weak areas of cognitive function are suspect.

---

[12] There were changes noted between the first Butner MRI in February 2007 and the second Butner MRI in July 2007.

- Test results indicate that Knox was not consistently putting forth his best effort during testing.

- A few poor scores, such as Knox had, could have occurred by chance. Therefore, it is important to look at his overall profile of scores, which is inconsistent with a finding of cognitive deficits.

- Though Knox's MRI results could be consistent with dementia, they do not necessarily mean that he has dementia nor are they indicative of his functional abilities.

- The drug prescribed to treat Knox's prostate cancer is not known to cause cognitive deficits.

- Behavioral observation of Knox during his 4-month stay in Springfield is inconsistent with dementia. He could remember dates, times, appointments, learn new information and functioned well in the facility.

(*Id.* at 22-24.)

As to the ultimate question of competency to stand trial, Dr. Denney provided the following opinion:[13]

> Based on available information, it is the undersigned evaluator's opinion that Mr. Knox suffers from no mental disease or defect sufficient enough to render him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. Mr. Knox does have somewhat slower mental processing speed, limited formal education and a likely low reading ability. Mr. Knox will need to be provided with documents in advance in order to give him adequate time to read them, and may need complicated written material explained to him.

### III. Restoration of Competency Hearing—June 21, 2010

The government relied on the MCFP Springfield Forensic Neuropsychological Report to support its position that Knox is now competent to stand trial. Dr. Robert L. Denney, the

---

[13] Whether or not he has dementia or some other cognitive impairment, Knox has performed poorly on tests designed to measure competency to stand trial. The report examines various competency tests administered over the years and notes that the results have "fluctuated in a pattern . . not consistent with . . . dementia" but '[r]ather . . . suggest[ed] inconsistent effort or unwillingness to participate." (Id. at 26.)

neuropsychologist who evaluated Knox at MCFP Springfield, testified at the hearing, primarily under cross examination by the defense. Dr. Denney's testimony lent more credibility to the report, as he explained in detail the testing procedures, observations of the defendant, the reasons for his opinion and the reasons for different diagnostic opinions regarding Knox's competency. Knox underwent eleven different psychological tests at Springfield, all of which were either administered by Dr. Denney or under his direct supervision. Dr. Denney himself interviewed Knox four times and made clinical observations during testing and informal interactions.

Dr. Denney clarified the role of the MRI brain scan results in this case. First, a diagnosis cannot be made on radiology findings alone; clinical findings are also necessary. Knox's MRI findings are positive for mild to moderate brain atrophy and leukoariosis (cloudy changes in the white matter of the brain). Such findings are not normal, but they are not unusual for a person of Knox's age. These changes may indicate dementia, but they may also present in persons who function normally. Consequently, imaging alone does not provide the answer. The question, then, is how a patient actually functions. In Dr. Denney's words, "real world functioning always trumps test results."

Dr. Denney also succinctly summarized why his diagnosis was different from others. Dr. Koch did not use age-appropriate norms when interpreting the test data. Dr. Guiterrez, who is a clinical psychologist doing forensic work, was "a little off" in his interpretation of test results but also Knox showed more effort on those tests. Dr. Lucking's testing at FMC Butner was literally bedside testing and, therefore, not as precise as the testing performed at MCFP Springfield.

Regarding competency to stand trial, Dr. Denney testified that in his clinical opinion Knox does not have dementia or neurocognitive disorder. Knox does have mild depression but that does not affect his competency. Dr. Denney believes that Knox can understand the nature of

the proceedings and can assist in his defense, if he chooses to assist. Further, Dr. Denney does not believe that it is necessary to make special accommodations or to slow the pace of proceedings,[14] as the Butner evaluation team suggested.

## IV. Discussion

In addition to the issue of Defendant's competency to stand trial, the Court is faced with defense counsel's claim that he could not adequately prepare for the competency hearing due to lack of time and discovery. Both of these issues are addressed below.

### *Court's Denial of Defendant's Motion Continue*

The defense's request for a continuance must be viewed in the broader context of these proceedings. The primary basis for defendant's continuance motion was the need for Dr. Koch to obtain and review the test data. That was also the basis for Defendant's motion to continue the 2007 restoration of competency hearing scheduled when Knox returned from FMC Butner. The result was months of delay and, ultimately, a *joint* request from the Defendant and the government to commit Knox to MCFP Springfield for further evaluation. The order committing Defendant to MCFP Springfield specifically incorporated the defendant's request for neuropsychological testing. Defendant obtained the testing he requested, and at this point the cycle of testing, evaluation and delay must end. The Court has sufficient information from which to make a competency determination. *Cf. United States v. Jones*, 200 Fed. Appx. 915, 921 (11th Cir. 2006) (court's discretion whether to order additional psychological testing). At the competency hearing, defense counsel renewed his motion to continue and insisted that he was

---

[14] Knox has proved to have a greater reading ability than demonstrated in previous evaluations. At MCFP Springfield, Knox read, understood and commented on the Prozac information sheet. Dr. Denney investigated and determined that the information sheet was written on an 8th-grade reading level. In addition, Knox read and commented on his indictment while talking with Dr. Denney.

not prepared to go forward. His performance proved otherwise. Counsel's cross-examination of Dr. Denney was thorough and demonstrated that he was well prepared.[15]

*Competency to Stand Trial*

Legal Standard

Because the Defendant was previously found incompetent to stand trial and committed for restoration of competency, the hearing in this matter proceeded under 18 U.S.C. § 4241(e), which states:

> If, after the hearing, the court finds by a preponderance of the evidence that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, the court shall order his immediate discharge from the facility in which he is hospitalized and shall set the date for trial or other proceedings.

The threshold for lack of competency is high. "[A] criminal defendant must lack either 'a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' or 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Miller*, 531 F.3d 340, 350 (6th Cir. 2008) (quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). "In determining competency, the district court may rely on numerous factors, including expert medical opinions and the court's observation of the defendant's demeanor. Low intelligence or a mental deficiency does not render a defendant incompetent per se." *United States v. Robinsons*, 253 F.3d 165, 1068 (8th Cir. 2001) (internal citations omitted).

---

[15] Defense counsel also sought a continuance to obtain more medical records from Defendant's Oklahoma City hospital. However, there is simply no evidence that Knox suffered an injury (or illness) in transit from Springfield to Mobile affecting his competence to stand trial.

17

## The Defendant is Competent to Stand Trial

The Court finds by a preponderance of the evidence that the Defendant is competent to stand trial. This finding is based on the MCFP Springfield evaluation and Dr. Denney's testimony and is also supported by other evidence in the record.

*Medical Evidence*

The MCFP Springfield report and Dr. Denney's testimony are persuasive for many reasons. First, the need for a neuropsychological evaluation has been a recurring theme in previous psychological assessments of this Defendant. Dr. Denney is a neuropsychologist whose qualifications are unquestioned. He has conducted one of the most thorough forensic psychological evaluations this Court has ever seen. He has administered the tests suggested by Defendant's expert, plus many more. Dr. Denney's testimony withstood vigorous cross examination by defense counsel, leaving the Court with the firm impression that his expert opinion is reliable.

In this case there have been several expert opinions and varying diagnoses. When expert opinions differ, the Court obviously cannot be faulted for choosing one opinion over another. *See United States* v. *Izquierdo*, 448 F.3d 1269, 1278 (11th Cir. 2006). The Court rejects Dr. Koch's diagnosis that the Defendant suffers from dementia. Both Dr. Guiterrez (FDC Miami) and Dr. Lucking (FMC Butner) rejected the dementia diagnosis. Dr. Guiterrez found, as did Dr. Denney, that Dr. Koch had simply used the wrong demographic data to interpret Defendant's test results.[16] Similarly, the Court rejects the diagnosis assigned by Dr. Guiterrez and by Dr. Lucking--Cognitive Disorder NOS. As discussed above, Dr. Guiterrez cited the need for further

---

[16] Dr. Koch compared Defendant's test results to results of the general population rather than those of similar age, race, gender, etc. Consequently, Defendant's level of impairment appeared to be greater than it actually was.

18

neuropsychological testing. Dr. Lucking's report was based on "bedside" neuropsychological testing and, when read in its entirety, does not provide a clear picture of the reasons for Defendant's "cognitive impairments." Dr. Denney has greater expertise in the field of neuropsychology and also had more and better diagnostic tools available to him. The Court accepts Dr. Denney's diagnosis that the Defendant does not have a mental disease or defect (other than mild depression).[17]

Finally, the three BOP evaluations are not necessarily in conflict. What is obvious from all of the evaluations is that this has been a difficult case to diagnose. There have also been complicating intervening factors, such as Defendant's other health problems. The FDC Miami evaluation concluded that the Defendant could be restored to competency. The FMC Butner evaluation concluded that he had been restored to competency. The MCFP Springfield evaluation concluded that he is competent to stand trial.

*Other Evidence of Competency*

In finding the Defendant competent, the Court also takes into account Defendant's demonstrated level of functioning. In telephone conversations with his wife or significant other (recorded at MCFP Springfield), Defendant was able to recall events, calculate money and dates, and carry on normal conversation. He also read and understood a Prozac information sheet as well as his own indictment. He functioned well within the institution. Likewise, during his stay at FMC Butner, Defendant learned and retained new information about his medical care,

---

[17] In concluding that the Defendant does not have a mental disease or defect, the Court is cognizant of the positive MRI brain scan results. The Court credits Dr. Denney's testimony regarding the use of radiological images. A person with the Defendant's MRI results may or may not have cognitive impairment. So the real question is how Defendant actually functions, and the answer to that is found in clinical observations set out in the MCFP Springfield report and elsewhere.

19

remembered dates of treatments, types of treatments performed and was able to correct the PA about the accuracy of information.

Furthermore, Defendant's *pro se* filings in this case show a higher level of understanding or functioning that the Court would expect of one with a cognitive disorder. In late 2005, just a short time before the competency issue arose, the Defendant filed a *pro se* motion for new counsel because his attorney had failed to communicate with him and failed to prepare for trial. (Doc. 78.) More recently, in February 2010 the Defendant filed a type-written request with the Clerk of Court for a copy of his docket sheet. The request was signed by the Defendant and mailed from MCFP Springfield. (Doc. 436.)

## V. Conclusion

The Court finds by a preponderance of the evidence that the Defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense. Accordingly, the Defendant is now competent to stand trial. This case shall be set on the **August 2010** criminal trial term. The Clerk of Court is directed to refer this matter to the Magistrate Judge for a pretrial conference.

**DONE** and **ORDERED** this the 29th day of June, 2010.

s/*Charles R. Butler, Jr.*
**Senior United States District Judge**